FEDERMAN & SHERWOOD
William B. Federman
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
Telephone:  (405) 235-1560
Facsimile:   (405) 239-2112

Edwin "Brad" Stanley
EDWIN B. STANLEY, P.C.
8767 East Via del Commercio, Ste. 103
Scottsdale, AZ  85258
Telephone:  (480) 607-0780
Facsimile:  (480) 907-2950
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| MICHAEL SCIMECA, Derivatively and on behalf of Nominal Defendant, AMKOR TECHNOLOGY, INC. | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Case No. 2:06-cv-00562-PGR |
| v. | ) ) | |
| JAMES J. KIM, KENNETH T. JOYCE, BRUCE FREYMAN, JOHN N. BORUCH, WINSTON J. CHURCHHILL, GREGORY K. HINCKLEY and JAMES W. ZUG, | ) ) ) ) ) ) | **VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | ) ) | |
| and | ) ) | |
| AMKOR TECHNOLOGY, INC., | ) ) | JURY TRIAL DEMANDED |
| Nominal Defendant. | ) ) ) | |

Plaintiff Michael Scimeca ("Plaintiff"), derivatively and on behalf of Nominal Defendant Amkor Technology, Inc. by and through his undersigned attorneys, for his Complaint against Defendants herein, alleges the following based upon personal knowledge of the Plaintiff, and on information and belief as to all other matters, based upon*, inter alia,* the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Amkor Technologies, Inc. ("Amkor" or the "Company") and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Amkor against certain current or former officers and directors of Amkor seeking to remedy the Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and negligence that occurred from October 27, 2003 through the present, (the "Relevant Period") and that have caused substantial losses to the Company.[1]

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between October 27, 2003 and July 1, 2004, the Relevant Period

2.      Amkor operates as a subcontractor of semiconductor packaging and test services worldwide.   During the Relevant Period, Defendants caused or allowed Amkor to issue a series of earnings releases disseminated to the investing public and the Company's shareholders that falsely portrayed the Company's true business prospects.   These earnings releases in turn caused the value of the Company's shares to be artificially inflated levels during the years ending 2003 and 2004.   Further, Defendants caused or allowed Amkor to improperly prop-up its financial results by shipping its customers inventory far in excess of the demand for its products.   This practice would eventually adversely impact Amkor's future sales.

3.      Amkor's Audit Committee, which was comprised during the Relevant Period of Defendants Winston J. Churchill ("Churchill"), Gregory K. Hinckley ("Hinckley") and James W. Zug ("Zug"), was responsible for reviewing and discussing these earnings releases before releasing them to the public and the Company's shareholders.   The Audit Committee is also responsible for discussing Amkor's internal audit function.   Nevertheless, the Company's Audit Committee was asleep at the wheel, thus allowing certain of Amkor's top officers, including Defendants James J. Kim ("Kim"), John N. Boruch ("Boruch"), Bruce J. Freyman ("Freyman") and Kenneth T. Joyce ("Joyce") to direct the release of false and misleading information and the Company's distribution channels in

continues through this day instead of ceasing on July 1, 2004, the day before the public became aware of the wrongdoings at the Company.

I:\AmkorTechnology\Pleadings\Amended Complaint.doc

order to portray the illusion of growth necessary to justify their exorbitant personal compensation.  Specifically, Defendants Kim, Boruch, Freyman, and Joyce received a combined $6,963,257 in salary and incentive compensation and over 3,190,000 stock options during the Relevant Period.

4.     On November 6, 2003, Defendants directed Amkor to issue a press release announcing that the Company had priced a follow-on offering of 7 million shares of common stock at $19 per share and had granted the underwriters an option to purchase up to 1,050,000 additional shares to cover over-allotments. As a result of Amkor's artificially inflated value, the follow-on offering raised approximately $152 million.  Although the follow-on offering successfully generated capital for Amkor, the Company's improper statements issued in connection with the offering would ultimately weaken the Company's credibility and hamper its ability to raise further capital.

5.     On March 8, 2004, Defendants directed the Company to price an offering of $250 million worth of senior unsecured notes.  The value of these notes, however, was artificially inflated due to the false statements that Amkor was issuing at that time.  Although the debt offering successfully generated another $250 million worth of capital for Amkor, the Company's improper statements issued in connection with the debt offering would further weaken the Company's credibility and hamper its ability to raise further capital.  The net effect of the follow-on offering and the debt offering was to create the appearance of short term growth that Defendants Kim, Boruch, Freyman and

Joyce needed to justify the millions of dollars they reaped in unjustified bonuses and other incentive compensation.

6.      On April 27, 2004, Defendants caused or allowed the Company to issue its earnings release for first quarter 2004.  The earnings release revealed that the Company was experiencing weakness in its cell phone products and was having production constraints at its foundries.  The market responded negatively to these disclosures and the Company's value deflated from $13.42 per share to $9.16 per share.

7.      On July 1, 2004, Defendants caused or allowed the Company to announce that it was reducing its guidance for second quarter 2004 to 6 cents per share as compared with prior guidance of 17 to 22 cents per share.  As a result of this disclosure, the Company's value declined to $5.79 per share.

8.      The second quarter 2004 results were released on July 27, 2004. On this date, the Company further disclosed that its customers were undergoing inventory corrections.  Thus, the day of reckoning had arrived and Defendants would now have to face the long term effects of the channel stuffing that they had utilized to buoy Amkor's financial results during the Relevant Period.

9.      The Company's Relevant Period statements were each materially false and misleading because they failed to disclose and/or misrepresented the following adverse facts which were known or should have been known by each of the Defendants:

(a)     that the Company was stuffing its customers with inventory far in excess of demand for the products and, as a result, customers' inventories were rising above historical levels such that future sales would be impacted;

(b)     that the Company was experiencing rapidly rising material costs which were far in excess of budgeted material costs, thereby negatively impacting the Company's profit margins; and

(c)     that the Company had stuffed its distribution channels prior to its follow-on offering and debt offering in order to artificially inflate the Company's operating results so that the Company could successfully raise $402 million.

10.     On October 12, 2004, the Securities and Exchange Commission ("SEC") initiated an informal investigation into Defendants' improprieties.   On August 22, 2005, this investigation was elevated to a formal investigation.   The Company is now faced with massive liability from several federal securities class action lawsuits as well as the SEC investigation.   Moreover, the Company's corporate image has been irreparably damaged and its market capitalization has been diminished by over $2.7 billion.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C.§1322(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.

12.     This action is not a collusive one designed to confer jurisdiction on a Court of the United States which it would not otherwise have.

13.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, occurred in this District. Defendants either reside in or maintain executive offices or participated in board meetings in this District, and have received substantial compensation in this district by engaging in numerous activities and conducting business here.

## PARTIES

14.     Plaintiff, Michael Scimeca, as set forth in the accompanying Verification, is, and was during the period in which the wrongdoing alleged herein was occurring, a shareholder of Amkor.  Plaintiff is a citizen of the State of New Jersey.

15.     Nominal Defendant Amkor is a Delaware corporation with its executive offices located at 1900 South Price Road, Chandler Arizona  85248.

16.     Defendant James J. Kim ("Kim" or "James Kim") is a citizen of the Commonwealth of Pennsylvania.  He has served as the Company's Chief Executive Officer and Chairman of the Board since September 1997.

17.     Defendant Kenneth T. Joyce ("Joyce") is a citizen of the State of Arizona.  He was, at all relevant times, the Company's Chief Financial Officer.

18.     Defendant John Boruch ("Boruch") is a citizen of the State of Arizona.  He was the Company's President and Chief Operating Officer during the Relevant Period until he was promoted to Vice Chairman in January, 2004.

He then resumed those positions in August 2004.  Boruch also served as a director of the Company until January 2006 when he resigned his positions with the Company.

19.     Defendant Bruce Freyman ("Freyman") is a citizen of the State of Arizona. He was, between January 2004 and August 2004, the Company's President and Chief Operating Officer.

20.     Defendant Winston J. Churchill ("Churchill") is a citizen of the Commonwealth of Pennsylvania.  He has been a member of Amkor's Board of Directors from July 1998 to the present.

21.     Defendant Gregory K. Hinckley ("Hinckley") is a citizen of the State of Oregon.  He has been a member of Amkor's Board of Directors from November 1997 to the present.

22.     Defendant James W. Zug ("Zug") is a citizen of the Commonwealth of Pennsylvania.  He has been a member of Amkor's Board of Directors from January 2003 to the present.

23.     Defendants Kim, Joyce, Freyman, Boruch, Churchill, Hinckley and Zug are referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Amkor's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading

prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

### DUTIES OF THE INDIVIDUAL DEFENDANTS

24.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.    The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.     To discharge their duties, the officers and directors of Amkor were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Amkor were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Amkor conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

26.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Amkor, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

27.    The Individual Defendants breached their duties of loyalty and good faith by allowing Defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of Defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws.  As a result, Amkor has

expended and will continue to expend significant sums of money.   Such expenditures include, but are not limited to:

(a)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)    the cost to obtain additional funds through borrowing which is now higher because Amkor's stock price has declined;

(c)    additional costs in the form of increased directors' and officers' liability and fiduciary liability insurance premiums;

(d)    costs incurred from directing manpower to correct Amkor's defective internal controls; and

(e)    costs incurred in investigating and defending Amkor and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

28.    Moreover, these actions have irreparably damaged Amkor's corporate image and goodwill.   For at least the foreseeable future, Amkor will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Amkor's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## SUBSTANTIVE ALLEGATIONS

29.     Amkor operates as a subcontractor of semiconductor packaging and test services worldwide.  It offers traditional packaging, which includes traditional leadframe products; and advanced packaging, which includes advanced leadframes and laminate products.  Amkor's test solutions include wafer probe, final test, strip test, marking, bake, drypack, and tape and reel.  The Company tests various devices, including digital, linear, mixed signal, memory, radio frequency, and integrated combinations of these technologies.   Amkor also provides engineering services, including test program development, test hardware development, test program conversion, device characterization, and qualification testing.   The Company offers its services to communications, computing, consumer, industrial, and automotive applications.

30.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Amkor a duty to insure that the Company's public statements fairly presented, in all material respects, the Company's business prospects, as well as all other issues material to the Company's operations.   In order to adequately carry out these duties, it was necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.   Furthermore, Defendants Churchill, Hinckley and Zug, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's Charter which provides that the Audit Committee is responsible for reviewing and discussing with management and the independent

auditors Amkor's earnings releases.   Defendants Kim, Boruch, Freyman and Joyce as officers of Amkor, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.   Moreover, Defendants Kim, Boruch, Churchill, Hinckley and Zug as directors of Amkor had ample opportunity to discuss this material information with management and fellow directors at Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board of Directors.   Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Amkor to the investing public and the Company's shareholders during the Relevant Period.

31.   On October 27, 2003 Amkor issued a press release entitled "Amkor Reports Third Quarter 2003 Results."   Therein, the Company, in relevant part, stated :

> Amkor Technology, Inc. (Nasdaq: AMKR) reported third quarter sales of $424 million, up 12% sequentially and up 8% over the third quarter of 2002.  Amkor returned to profitability in the third quarter, with net income of $16 million, or $0.09 per share, compared with a loss of $59 million, or ($0.36) per share, in the third quarter of 2002.
>
> Amkor's third quarter net income includes a non-cash gain of $10 million, or $0.06 per share, in connection with the reversal of a tax accrual related to tax periods that have closed.  Third quarter results also include a charge, with no tax effect, of $2 million, or $0 .01 per share, for debt retirement costs in connection with open market purchases of $28 million in 9¼% Senior Notes due 2008.  Amkor's results for the third quarter of 2002 included $11 million in after-tax charges associated with factory consolsidation and operating efficiency initiatives.

"This was a landmark quarter, in which we achieved record unit shipments in most of our ten factories and returned the corporation to positive net income after an unprecedented industry downturn," said James Kim, Amkor's chairman and chief executive officer.

"We believe the outsourced semiconductor assembly and test industry is poised for a period of sustainable growth, at a rate that will outpace the semiconductor industry.  We are encouraged that strengthening customer forecasts may partially offset the seasonal weakness typical of our first calendar quarter.  Looking broadly at 2004, we are positioning our organization to achieve annual revenues in the neighborhood of $2 billion, and to reach a peak quarterly gross margin of 27% to 30% during the second half of 2004.  We remain committed to improve productivity and profitability, maintain strong liquidity, reduce debt and enhance shareholder value," said Kim.

"During the third quarter we saw accelerating demand, particularly from customers supplying the cell phone industry, for a wide range of advanced packages, including stacked CSP, ChipArray BGA, MicroLeadFrame and camera modules," said John Boruch, Amkor's president and chief operating officer.  "Business strengthened as the quarter progressed, with a large number of customers over-supporting their forecasts as demand materialized faster than initially projected.  As customer forecasts continued to strengthen, we accelerated our investment in leading-edge assembly and test equipment, and now expect total 2003 capital expenditures to exceed $200 million.  As previously announced, Amkor's bank credit facility has been modified to accommodate this increased capital budget."

"Third quarter gross margin rose to 23.9% from 19.6% in the second quarter.  Third quarter operating margin rose to 11.2% from 6.0% in the second quarter reflecting the positive operating leverage in our business and the continued high utilization of assets supporting our high growth package families," said Ken Joyce, Amkor's chief financial officer.  "Over the past two years we have made substantial progress enhancing the profitability of our business by improving operating efficiencies, increasing manufacturing capacity in strategic growth areas and managing costs."

"Our liquidity remained solid, with cash and equivalents of $341 million at September 30," said Joyce.  "During the quarter we received $19 million as the first scheduled payment of a $38 million

receivable from Dongbu relating to the sale in 2002 of 20 million shares of Anam Semiconductor Inc. common stock.  The remaining $19 million payment is scheduled for February 2004.  In the third quarter we also sold an additional five million shares of ASI for net cash proceeds of $12 million.  At September 30, short-term debt totaled $54 million, principally relating to working capital lines of credit supporting our operations in Japan and Taiwan.  As noted earlier, during the third quarter we purchased and retired $28 million of our 9 ¼ % Senior Notes due 2008."

"We are approaching the third anniversary of our successful joint venture with Toshiba, and in January 2004 we will purchase the remaining 40% of the JV with cash payments ranging from $10 million to $15 million.  This amount includes a payment of $2 million to terminate our commitment to purchase a tract of land adjacent to the Amkor Iwate facility," said Joyce.

32.    In response to this positive earnings announcement, the value of Amkor stock inflated from $16.19 per share to $19.38 per share, an increase of almost 20% on heavy trading volume.

33.    On November 6, 2003, Amkor issued a press release entitled "Amkor Technology Announces Pricing of Public Offering of Common Stock." Therein, the Company, in relevant part, stated :

Amkor Technology, Inc. (Nasdaq: AMKR) today announced that its follow-on public offering of 7,000,000 shares of its common stock has been priced at $19.00 per share.  All of the shares are being offered by Amkor.  The net proceeds from the offering are being used to repay a portion of the indebtedness outstanding under one or more of the company's bank loans, senior notes, subordinated notes, convertible notes and/or other indebtedness.

The offering was made through an underwriting syndicate led by Citigroup Global Markets Inc., as the sole bookrunning lead manager.  Citigroup, Deutsche Bank Securities and J .P. Morgan Securities Inc. acted as joint lead managers, and Bear, Stearns & Co. Inc. acted as co-manager.  Amkor has granted the underwriters

an option to purchase up to 1,050,000 additional shares to cover over-allotments.

As a result of Amkor's artificially inflated value, the follow-on offering raised approximately $152 million.   Although the follow-on offering successfully generated capital for Amkor, the Company's improper statements issued in connection with the offering would ultimately weaken the Company's credibility and hamper its ability to further raise capital.

34.   On January 28, 2004, Amkor issued a press release entitled "Amkor Reports Fourth Quarter 2003 Results."  Therein, the Company, in relevant part, stated:

> Amkor Technology, Inc. (Nasdaq: AMKR) reported fourth quarter sales of $459 million, up 8% sequentially and up 23% over the fourth quarter of 2002.  Amkor's fourth quarter net income was $23 million, or $0.13 per share, compared with a loss of $196 million, or ($1 .19) per share, in the fourth quarter of 2002.
>
> Amkor's fourth quarter 2003 net income includes a $7 million gain on the sale of a marketable security partially offset by $5 million in debt retirement costs associated with the repurchase of convertible notes. Amkor's $196 million loss in the fourth quarter of 2002 included $172 million in non-cash charges associated with (i) establishment of a $129 million valuation allowance against deferred tax assets; (ii) a $33 million impairment in Amkor's investment in Anam Semiconductor, Inc. and (iii) $10 million of estimated costs to consolidate two factories.
>
> For the full year, revenue was $1.6 billion compared with $1.4 billion in 2002.  Amkor's net income in 2003 was $2 million, or $0.01 per share, compared with a loss of $827 million, or ($5.04) per share, in 2002.
>
> "We have completed a year of significant accomplishment and believe that 2004 will present exceptional growth opportunities for Amkor," said James Kim, Amkor's chairman and chief executive officer."  Our 2003 results exceeded our initial expectations and

were achieved during a year in which we realigned our operating structure, enhanced our balance sheet and strengthened our product development, sales and support organizations.    These strategic initiatives place Amkor in an excellent position to drive continued expansion of the outsourcing model for semiconductor assembly and test."

"Since 2001 we have cautiously managed our business in an environment of economic uncertainty and cloudy visibility," continued Kim.    "This environment began to change during 2003 as customer demand improved.    We believe the semiconductor industry is now entering a period of strong expansion.    We are seeing strength in the communications, computer and consumer markets.    During the fourth quarter our customer forecasts continued to strengthen, and we now expect to achieve revenue growth in the first quarter of 2004, which is a significant reversal of what is normally a seasonally down quarter.    Historically, a sequential increase in our first quarter sales has always signaled a strong year for Amkor.    Last quarter I said we were positioning Amkor to achieve $2 billion in revenue in 2004; I now believe we will exceed $2 billion."

"In response to broad-based customer demand we have re-ignited Amkor's growth engine and are aggressively moving to increase production capacity to meet demand that our customers are already forecasting," continued Kim."    We are focused on asserting our leadership position in key package technologies.    We have budgeted first quarter capital expenditures of $200 million to accommodate robust customer demand and expand our operational footprint in Taiwan and China.    We will most likely spend between $300 and $500 million for 2004."

"We see 2004 as a year of great promise for Amkor.    We intend to accommodate growth opportunities while improving our capital structure, and we remain committed to de-leveraging the balance sheet," said Kim.

"Over the past year we've experienced unprecedented demand for stacked CSP, chip scale BGA, system-in-package, MicroLeadFrame®, camera modules and other advanced package families that are especially well suited for wireless and digital consumer electronic applications," said Bruce Freyman, Amkor's newly appointed president and chief operating officer.    "We've also had exceptional demand for several legacy package families, and for strip test.    During this period we've significantly increased

manufacturing capacity and engineering support for the high-growth areas of our business.  We are stepping up our product development and R&D activities to ensure that our packaging and test capabilities continue to keep pace with advances in the front end.  We also are working on a variety of innovative design collaborations with several OEMs."

"Fourth quarter gross margin was 25%.  As our business expansion program moves into high gear in Q1 and Q2, our goal will be to increase production capacity to get ahead of customer demand," said Ken Joyce, Amkor's chief financial officer.   "We expect the associated depreciation expenses and to a lesser extent factory operating expenses to put some downward pressure on gross margin in the first quarter of 2004, with minimal impact on operating margin as first quarter SG&A expenses should increase only modestly."

"During 2003 we strengthened our capital structure -- reducing debt by $129 million and increasing shareholders equity by $147 million through the issuance of common stock.  Our 2003 initiatives have yielded annualized interest expense savings of $15 million," said Joyce.

"As Jim Kim stated, we expect to grow significantly this year, and to support this robust growth we continue to evaluate strategies to further enhance our capital structure.   We are prepared to supplement our cash resources with proceeds from capital market activities depending on the pace of our capital expenditure program," said Joyce.

35.    On March 8, 2004, Amkor issued a press release entitled "Amkor Technology to Issue $250 Million in Notes."  Therein, the Company, in relevant part, stated:

Amkor Technology, Inc. (Nasdaq: AMKR) today announced its intent to issue $250 million principal amount of senior notes due 2014.

Amkor intends to use the net proceeds of the issuance to repay amounts outstanding under its senior secured credit facility and for general corporate purposes, including capital expenditures.

> The notes are being sold to qualified institutional buyers in reliance on Rule 144A and outside the United States in compliance with Regulation S under the Securities Act of 1933.  The notes have not been registered under the Securities Act of 1933, as amended, and may not be offered or sold in the United States except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws.

Although the debt offering successfully generated capital for Amkor it would ultimately weaken the Company's credibility and hamper its ability to further raise capital.  The net effect of the debt offering was to increase the appearance of short term growth which Defendants needed to justify the millions that they reaped in unjustified bonuses and other incentive compensation.

36.    On April 27, 2004, Amkor issued a press release entitled "Amkor Reports First Quarter 2004 Results."  Therein, the Company, in relevant part, stated:

> Amkor Technology, Inc. (Nasdaq: AMKR) reported first quarter sales of $465 million, up 1% sequentially and up 36% over the first quarter of 2003.  Amkor's first quarter net income was $12 million, or $0.07 per share, compared with $15 million, or $0.09 per share, in the first quarter of 2003.

> Amkor's first quarter 2004 net income includes a pre-tax charge of $2.7 million, in connection with the prepayment of Amkor's term loan under its senior secured credit facility.  In the first quarter 2003 Amkor's net income included a loss from continuing operations of $40 million, or ($0.24) per share, which was offset by income of $55 million, or $0.33 per share, in connection with its divested wafer fabrication services business.

> "While first quarter revenue came in slightly below our forecasted range, we nonetheless were pleased to achieve sequential revenue growth, in contrast to what is normally a seasonally down first quarter," said James Kim, Amkor's chairman and chief executive

officer."  The increase in Q1 revenue and continued growth in our customers' long range forecasts suggest that we are in the midst of a broad-based industry recovery, and we remain confident of exceeding $2 billion revenue in 2004.  This recovery, combined with what we believe is an acceleration in the outsourcing of semiconductor assembly and test, presents compelling opportunities for Amkor to strengthen our operational capabilities and expand our customer penetration."

"Due to relative weakness in our cell phone products and production constraints at foundries, first quarter demand for some advanced package products did not materialize as forecast," said Bruce Freyman, Amkor's president and chief operating officer.  "During the first quarter we increased capacity in several package products which were on allocation for much of 2003 in order to get ahead of demand, and we are now in a more favorable position to support expected growth of these package products through 2004.  We also experienced strong growth in our legacy package products during the quarter, which further suggests that integrated device manufacturers (IDMs) have generally not invested in additional assembly capacity."

"First quarter gross margin of 24% was down 1% sequentially due principally to higher material costs," said Ken Joyce, Amkor's chief financial officer.  "We anticipate that second quarter gross margin will remain at 24%, despite higher sales volume, due to higher depreciation and labor costs as we continue to expand production space, add equipment and increase factory workforce in advance of what we expect will be a strong second half.  These costs include expenses associated with equipping lines and qualifying new business in our newly acquired facility in Taiwan.  We currently expect gross margin to improve in the second half of 2004.

"First quarter SG&A expenses included $5 million in legal costs in connection with the epoxy mold compound litigation.  As previously disclosed, this litigation relates to a certain mold compound used in the assembly of various IC packages which is claimed to have caused a number of package failures on the part of our customers. We expect the current level of legal costs will continue through 2004. We believe we have very good defenses to these claims and have asserted our own claims against the supplier of the compound," said Joyce.

"First quarter capital expenditures totaled $171 million, including $41 million associated with our previously announced purchase of a 354,000 square foot assembly and test facility in Taiwan. We continue to invest in key package and test areas where we see longterm growth and are currently budgeting second quarter capital expenditures of $125 -150 million," said Joyce.

"In March we enhanced the company's liquidity by issuing $250 million in 7 1/8% senior notes due 2011 and using the net proceeds to repay amounts outstanding under our senior secured credit facility and for general corporate purposes," said Joyce. "This provides us with the additional financial flexibility to pursue our growth initiatives.

"In April we sold 10.1 million shares of common stock of Anam Semiconductor, Inc. for cash proceeds of approximately $50 million," said Joyce. "This transaction will result in an after-tax gain of approximately $20 million, or $0.11 per share, which will be included in our second quarter results. The incremental cash will be used to fund ongoing capital investments. Following this sale, our investment in ASI has been reduced to 4.6 million shares, or approximately 4% of the company."

37.    On this news, shares of Amkor fell $4.26 per share, or 31.74%, to close, on April 27, 2004, at $9.16 per share.

## THE TRUTH IS REVEALED

38.    On July 1, 2004, Amkor issued a press release entitled "Amkor Revises Second Quarter Outlook" in which it announced that net income for second quarter 2004 was expected to be $.06 per share compared with prior guidance of $.17 to $.22 per share. Therein, the Company, in relevant part, stated:

Amkor said today that revenues for the second quarter ended June 30, 2004 are expected to be approximately 6% higher than the first quarter of 2004, compared with prior guidance of up 5% to 8%. Amkor expects gross margin for the second quarter to be around 19% compared with prior guidance of around 24%. Net income for

the second quarter is expected to be approximately 6 cents per diluted share, compared with prior guidance of 17 to 22 cents, principally due to lower than anticipated gross margin. Both the prior and revised EPS guidance include an after-tax gain of 11 cents per share from the sale of 10.1 million shares of ASI common stock.

**"Our second quarter gross margin shortfall is primarily attributable to a very unfavorable product mix," said Ken Joyce, Amkor's Chief Financial Officer." Our revenue from several high-margin advanced packages, including MicroLeadFrame(R), Stacked CSP and ChipArray(R)BGA, was less than we expected, reflecting weaker-than-normal support of customer forecasts in the wireless sector and some shortages of high-end wafers from the foundries.** The soft demand in our higher margin advanced packages was offset by stronger than anticipated support of forecasts in our lower margin PBGA business. In addition, we are still absorbing higher factory costs related to our capacity expansion initiatives, as well as an overall rise in material costs.

"In order to improve our margins during the second half of 2004, we are focusing our efforts on enriching our product mix, selectively raising prices, accelerating our movement to lower cost material vendors and negotiating lower prices with our existing laminate substrate vendors," said Bruce Freyman, Amkor's president and chief operating officer. "While forecasting the product mix has been difficult so far this year, if normal seasonal trends hold, we would expect an improvement in our product mix in the second half of 2004."

(emphasis added).

39.    On this news, shares of Amkor fell $2.39 per share, or 29.22%, to close, on July 1, 2004, at $5.79 per share.

40.    On July 27, 2004, Amkor issued a press release entitled "Amkor Reports Second Quarter 2004 Results." Therein, the Company, in relevant part, stated:

Amkor Technology, Inc. (Nasdaq: AMKR) reported second quarter sales of $493 million, up 6% sequentially and up 30% over the

second quarter of 2003.  Amkor's second quarter net income was $10 million, or $0.06 per share, and included after-tax gains of $14 million, or $0.08 per share, from the sale of 10.1 million shares of Anam Semiconductor, Inc. common stock and $2.5 million, or $0.01 per share, on the settlement of litigation with a software provider.  In the second quarter of 2003 Amkor reported a net loss of $51 million, or ($0.31) per share, which included a charge, with no tax effect, for debt retirement costs of $31 million, or ($0.19) per share.

**"This quarter's profitability was impacted by an unfavorable product mix and factory expenses associated with our capacity expansion initiatives," said James Kim, Amkor's chairman and chief executive officer.**

"From a strategic perspective, we are midway through a year in which we have undertaken a series of initiatives designed to position Amkor for long-term growth," said Kim.  "In March we acquired a 354,000 square foot assembly and test factory in Hsinchu, Taiwan, which provides needed space to accommodate our growing business in Taiwan.  In May we entered into a collaboration with IBM, which includes the acquisition of IBM's Singapore test operations and a 950,000 square foot manufacturing complex in Shanghai, together with a long-term supply agreement.

"Last week we took an important step positioning Amkor in the high growth markets for flip chip and wafer level packaging by announcing agreements to acquire North Carolina-based Unitive, Inc. and a majority interest in Taiwan-based Unitive Semiconductor Technology," said Kim.  "These acquisitions will give Amkor the industry's premier electroplated wafer bumping technology, together with the capability to provide complete turn-key solutions for flip chip on 200mm and 300mm wafers that incorporate bump, probe test, assembly and final test.

"With completion of the above initiatives, the facilities and equipment that we have added over the past several quarters should provide Amkor with sufficient production capacity for the foreseeable future. We are currently running at 73% of capacity, and while we will continue to make selected capital investments in flip chip and other strategic growth areas, further increases in assembly capacity will largely depend on customer demand.  We acknowledge that costs associated with our growth initiatives will constrain profitability and cash flow in the near-term, however we believe that these strategies will yield the best long-term return for our shareholders," said Kim.

I:\AmkorTechnology\Pleadings\Amended Complaint.doc

**"During the second quarter we experienced softer than expected demand for several of our advanced package families which carry higher-than-average gross margins, said Ken Joyce, Amkor's chief financial officer.  "We believe the softness in demand for our advanced packages was due to absorption of semiconductor inventory that was built-up in prior periods. Gross margin was also impacted by continued absorption of higher factory and labor costs related to our capacity expansion initiatives, particularly in Taiwan, where we acquired a new factory in March of this year, and in China, where we are in the process of facilitating our second 75,000 square foot building.**

**"Near term, our margins should remain under pressure in connection with absorption of our new acquisitions and continued underutilization of lines supporting advanced packages as the supply chain burns excess inventory," said Joyce.  "We are committed to improving the profitability of our core business while absorbing the costs associated with our growth initiatives.  Our model has a high degree of operating leverage, and gross margin will be heavily dependent on business volume and mix.  We are working to enhance the product mix and have selectively raised package prices.  We are qualifying lower cost material vendors and have negotiated lower prices with our existing laminate substrate vendors."**

"Second quarter capital expenditures totaled $124 million, bringing total, first-half capital expenditures to $295 million," said Joyce. "During the first quarter of this year, we embarked on a program to increase our production capacity for several advanced package families that experienced very strong growth in 2003.  Our goal was to get off allocation and ahead of projected near-term demand for these packages.  Now that we are comfortably ahead of demand, and in light of current business expectations, we are moderating our capital program for the remainder of this year and are currently budgeting capital expenditures of $80 million for the second half of 2004.  We are targeting to have positive free cash flow in the fourth quarter."

In April the company sold 10.1 million shares of common stock of Anam Semiconductor, Inc. for cash proceeds of approximately $50 million.  For financial accounting purposes, this transaction resulted in an after-tax gain of approximately $14 million, or $0.08 per share.

> In our first quarter, 2004 earnings release we estimated that this transaction would result in an after-tax gain of $20 million, or $0.11 per share; however, due to an increase in the effective tax rate from 11% to 35% for the year 2004, this after-tax gain has been adjusted as noted above.  For income tax purposes, there will be no tax payment required on this gain.  Following this sale, our investment in ASI has been reduced to 4.6 million shares, or approximately 4%.

(emphasis added).

41.    On October 12, 2004, Amkor issued a press release entitled "Amkor Discloses Informal SEC Inquiry," in which it announced that the SEC had begun an informal investigation into Company insiders trading of Amkor securities. Therein, the Company, in relevant part, stated:

> **Amkor Technology, Inc. (Nasdaq: AMKR) announced today that the Securities and Exchange Commission is conducting an informal inquiry into trading in the securities of Amkor.  The company believes that the inquiry relates to transactions in the company's securities by certain individuals, which may include certain insiders, during 2004.**  In connection with the informal inquiry, the company has received requests from the SEC to voluntarily produce documents and other relevant information concerning these matters, and Amkor is cooperating with these requests.

(emphasis added).

42.    On August 22, 2005, Amkor issued a press release announcing that the SEC's investigation had become formal.  Therein, the Company, in relevant part, stated:

> Amkor Technology, Inc. (Nasdaq: AMKR) announced today that the Securities and Exchange Commission (SEC) has issued a formal order of investigation arising from the previously announced informal inquiry concerning certain trading in Amkor securities.  Amkor believes that the investigation continues to relate to transactions in the company's securities by certain individuals, including certain insiders or former insiders and persons associated with them.  The

primary focus of the investigation appears to be activities during the period from June 2003 to July 2004.  Amkor has cooperated fully with the SEC on the informal inquiry and will continue to do so with the formal investigation.

43.    During the Relevant Period, and with the Company's stock trading at artificially inflated prices, Amkor completed a secondary offering of 8,050,000 million shares for gross proceeds of $152 million shares.  Amkor also issued $250 million principal amount of senior notes due 2014.

## REASONS THE STATEMENTS WERE IMPROPER

44.    The statements referenced herein were each materially false and misleading because they failed to disclose and/or misrepresented the following adverse facts which were known or should have been known by each of the Individual Defendants:

(a)    that the Company was stuffing its customers with inventory far in excess of demand for the products and, as a result, customer inventories were rising above historical levels such that future sales would be impacted;

(b)    that the Company was experiencing rapidly rising material costs which were far in excess of budgeted material costs, thereby negatively impacting the Company's profit margins; and

(c)    that the Company has stuffed its distribution channels prior to its follow-on offering and note offering in order to artificially inflate the Company's operating results so that the Company could successfully raise $402 million.

45.     As a result of the Individual Defendants' actions, Amkor's market capitalization has been damaged by over $2.7 billion, numerous securities class action lawsuits have been filed against the Company and the SEC has opened a formal investigation into the activities of certain Company insiders.

## DEMAND WOULD HAVE BEEN FUTILE

46.     Plaintiff brings this action derivatively in the right and for the benefit of Amkor to redress injuries suffered and to be suffered by Amkor as a result of the breaches of fiduciary duty by the Individual Defendants.   This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

47.     Plaintiff is an owner of Amkor common stock and was an owner of Amkor common stock during the time period in which the Individual Defendants' wrongful course of conduct alleged herein was occurring through the present.

48.     Plaintiff will adequately and fairly represent the interests of Amkor and its shareholders in enforcing and prosecuting its rights.

49.     Plaintiff did not make a demand on Amkor's board of directors to bring the claims alleged herein because such a demand would have been futile. At the time this derivative action was commenced, Amkor's board of directors consisted of seven members: Roger Carolin, Winston J. Churchill, Gregory K. Hinckley, James J. Kim, John T. Kim, Constantine N. Papadakis, and James W. Zug.  James Kim, Hinckley, Zug and Churchill have been named as Defendants in this action.  In addition, James Kim has been named a defendant in the related

securities class action lawsuits.   As detailed below, each of the directors is subject to substantial liability on the derivative claims alleged herein and is therefore in no position to render a disinterested judgment as to whether the Company should bring them, and/or lacks sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

50.    Each of the Defendant directors faces a substantial likelihood of liability in this action because of his failure, as a director, to assure that reliable systems of financial controls and information and reporting were in place and functioning effectively.   The dramatic breakdowns and gaps in those controls were so widespread and systemic that each of the Defendant Directors faces substantial exposure to liability for his total abrogation of his duty of oversight. These directors either knew or should have known that violations of law were occurring and took no steps in good faith to prevent or remedy that situation, proximately causing millions of dollars of losses to the Company.

51.    During the Relevant Period, James Kim personally participated in the issuance of false and/or misleading statements in press releases issued to the public and filed with the SEC and faces a substantial likelihood of being held liable for same.

52.    In addition, Director Defendant James Kim is exposed to substantial potential liability in this action because of his complete failure to put in place appropriate systems of financial, reporting and information and legal compliance

controls to assure the accuracy of financial and other information disclosed by the Company to the public and thereby prevent the dissemination of false and misleading information to the public.

53.    According to Amkor's Proxy Statements filed with the SEC on or about July 2, 2004 and July 28, 2005, Defendants Churchill, Hinckley and Zug were, during the Relevant Period, members of the Audit Committee of the Company's Board of Directors.   The Audit Committee is responsible, by its Charter, **for reviewing and discussing**, with management and the independent auditors, **Amkor's earnings releases**.  The Audit Committee is also responsible for discussing Amkor's internal audit function.   Thus, the Audit Committee was responsible for overseeing and directly participating in Amkor's financial reporting process.   Accordingly, Defendants Churchill, Hinckley and Zug breached their fiduciary duties of due care, loyalty and good faith because the Audit Committee participated in the preparation of earnings press releases that contained false and/or misleading material information.    Further, Amkor's deficient internal control structure allowed the Officer Defendants, including Defendant Kim, to direct the Company to stuff its distribution channels to create the appearance of short-term earnings growth.   Particularly, these Defendants reviewed and failed to correct Amkor's improper earnings releases issued between October 27, 2003 and July 1, 2004.   As a result these Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**The Members of the Board of Directors Lack Independence**

54.    Director Defendant James Kim, is the Company's current CEO and the founder of Amkor's predecessor company.   His principal occupation is his employment with Amkor.   For the years ending 2005 and 2004, the Company paid Kim $830,000 and $826,667 in salary.   For the year ending 2003, the Company paid Kim $790,000 in salary, $2,150,000 in bonuses and awarded him options to purchase 1,000,000 shares of Amkor stock.

55.    James Kim and his family, described by the Company's Form 10-K for the year ending 2005 as the "James J. Kim Family Control Group," own beneficially 46% of the Company's outstanding common stock.   As such, Defendant Kim completely controls and dominates the Board of Directors of the Company.   The Company admits as much in its SEC filings.   The Company's Form 10-K for the year ending 2005 filed with the SEC contains the following risk disclosure:

> **Continued Control by Existing Stockholders – Mr. James J. Kim and Members of His Family can Substantially Control the Outcome of all Matters Requiring Stockholder Approval**
>
> As of January 31, 2006, Mr. James J. Kim our Chief Executive Officer and Chairman of the Board, and members of his family beneficially owned approximately 46.0% of our outstanding common stock.   This percentage includes beneficial ownership of the securities underlying our 6.25% Convertible Subordinated Notes due 2013.   Mr. James J. Kim's family, acting together, substantially control all matters submitted for approval by our stockholders. These matters could include:
>
> o       The election of all of the members of our Board of Directors;

o       Proxy contests;

o       Mergers and Acquisitions involving our Company;

o       Tender offers; and

o       Open market purchase programs or other purchases of our
        common stock.

56.    Thus, because Defendant Kim personally selected each of the
Company's Directors and controls and dominates the Company and its Board of
Directors, demand upon the Board to bring legal action against Kim would be
futile.

57.    Indeed, over the years the Defendant Directors actions have
manifested a direction of corporate conduct in such a manner as to comport with
the wishes or interests of James Kim and his family to the detriment of the
Company and its shareholders.

58.    This is evident by the large number of business relationships and
transactions between the Kim family and the Company that have existed and
occurred over the years.

59.    JooHoo Kim, the brother of James Kim, served as the Company's
Executive Vice President of Corporate Strategy until 2005.  For the years ending
2005, 2004 and 2003, the Company paid JooHoo Kim $270,000, $264,616 and
$200,000, respectively, in salary.  The Company also paid JooHoo Kim $75,000
in bonuses in 2003 and awarded him options to purchase 150,000 Amkor shares.

60.     Director John T. Kim, the son of James Kim, was Amkor's Director of Corporate Development, and from 1992 to 2005 served as an employee of Amkor and its predecessor company.  John T. Kim's base salary was $120,000.

61.     JooHoo Kim owns with his children, 19.2% of Anam Information Technology, Inc., a company that provides computer hardware and software components to Amkor Technology Korea, Inc. (a subsidiary of Amkor).  During 2005, 2004 and 2003, the Company's purchases from Anam Information Technology, Inc. were $1.8 million, $1.2 million, and $2.9 million, respectively.

62.     JooHo Kim together with his wife and children, own 96.1% of Jesung C & M, a company that provides cafeteria services to Amkor Technology Korea, Inc.  During 2005, 2004 and 2003, purchases by the Company from Jesung C & M were $6.5 million, $6.4 million and $5.6 million, respectively.

63.     Dongan Engineering Company, Ltd. is 100% owned by JooCheon Kim, a brother of James Kim.  Dongan Engineering Company, Ltd. provides construction and maintenance services to Amkor Technology Korea, Inc. and Amkor Technology Philippines, Inc., both subsidiaries of Amkor.  During 2005, 2004 and 2003, the Company's purchases from Dongan Engineering Company, Ltd. were $.5 million, $3 million and $1.3 million, respectively.

64.     The Company purchases leadframe inventory from Acqutek Semiconductor & Technology Company, Ltd.  James Kim's ownership in Acqutek Semiconductor & Technology Company, Ltd. is approximately 17.7%.  During

2005, 2004 and 2003, purchases from Acqutek Semiconductor & Technology Company, Ltd. were $11.8 million, $11.8 million and $16.1 million, respectively.

65.    The Company leases office space in Westchester, Pennsylvania from trusts related to James Kim.  During 2005, 2004 and 2003, amounts paid by the Company for this lease were $.6 million, $1.1 million, and $1.1 million, respectively.  During 2005, 2004, and 2003, the Company's sublease income from this space was $.3 million, $.6 million and $.5 million, respectively.  The Company vacated a portion of this space in connection with its move of its corporate headquarters to Arizona.  In the second quarter of 2005 the Company paid a lease termination fee of approximately $.7 million and assigned sublease income to the trust.  The Company currently leases approximately 2,700 square feet of office space from the trust.

66.    In November 2005, the Company sold $100,000,000 of its 6.25% convertible subordinated notes due 2013 in a private placement to James Kim and certain Kim Family trusts.  The terms were approved by a majority of the Company's so-called "independent members of the Board of Directors."

67.    As disclosed in the Company's definitive proxy statement filed with the SEC on Form 14-A, on July 10, 2003, the Company has had a long-standing relationship with Anam Semiconductor, Inc.  Anam Semiconductor, Inc. was founded in 1956 by H. S. Kim, the father of James Kim.  In February 2003, the Company sold its wafer fabrication services businesses to Anam Semiconductor, Inc. for total consideration of $62 million.

68.    In separate transactions designed to facilitate a future merger between Anam Semiconductor, Inc. and Dongbu Group, the Company acquired a 10% interest in Acqutek from Anam Semiconductor, Inc. for $1.9 million; acquired the precision machine division (PMD) of Anam Instruments, a related party to Amkor, for $8 million; and Anam Instruments, which had been partially owned by Anam Semiconductor, Inc., used the proceeds from the sale of PMD to Amkor to buy back all of the Anam Instruments shares owned by Anam Semiconductor, Inc.  At the time of the Company's acquisition of its interest in Acqutek, James Kim held 25% ownership interest in Acqutek.  At the time of the Company's acquisition of PMD, Anam Instruments was owned 20% by Anam Semiconductor, Inc. and 20% by James Kim.  With respect to these transactions, the Company acknowledged that they were interrelated and that it is possible that if each of the transactions were viewed on a stand alone basis without regard to the other transactions, "we could have had different conclusions as to their value."

69.    As related in the Company's definitive proxy statement filed July 10, 2003, the Company historically has had other relationships with Anam Semiconductor, Inc. affiliated companies for financial services, construction services, materials and equipments.    Total purchases from Anam Semiconductor, Inc. and its affiliates included in cost of revenue for the years ended December 31, 2002, 2001 and 2000, respectively were $212.6 million, $161.6 million and $499.8 million.  Additionally, financial services performed by

Anam Semiconductor, Inc. and its affiliates included by the Company as interest expense for the year ended December 31, 2000 was $1.6 million.  Construction services and equipment purchases received by the Company from Anam Semiconductor, Inc. and its affiliates capitalized during the year ended December 31, 2002, 2001 and 2000 were $2.8 million, $14.7 million and $38.8 million, respectively.

70.    Total purchases from Acqutek included in cost of revenue for 2002, 2001 and 2000 were $16 million, $14 million and $29.2 million, respectively.

71.    The Company's Directors' indulgence of James Kim and his family to the detriment of the Company and its shareholders has not gone unnoticed by outside observers.  In a June 21, 2004 article published in Forbes entitled "Crony Capitalization. (Sarbanes-Oxley)," reporter Elizabeth MacDonald commented:

> Are these people in the corner office tone-deaf?   The public is clamoring for clean corporate governance, and here they are cutting themselves cute little side deals with shareholders' money.
> …
>
> FRIENDS AND FAMILY
> …
>
> Anam Semiconductor and Amkor Technology operate a world apart, but they enjoy a rather cozy relationship.  Anam, in Seoul, South Korea, makes microchips.  Amkor, of Westchester, Pa. packaged and sold them, hocking $874 million worth of Anam chips in 3 years, from 2000 to 2002, or 17% of Amkor's total sales in the period. Amkor, in the same time, paid $58 million to Anam for financial services, construction services, materials and equipment, which included assistance in building factories in the Philippines.  Amkor's chief executive: James Kim, 68.  Anam's founder: Kim's father, H.S. Kim.

Amkor held a 42% stake in Anam, which it acquired for $501 million in 1999 and 2000. But it took a $172.5 million charge on its Anam holdings in 2002 when Anam got hit by the downturn that swept the semiconductor industry. It has since pared its holdings to 4%, losing $275 million in the process. In February 2003 the son's Amkor sold its chip-packaging business to the father's Anam for $62 million. The Company admits in filings that investors "could have had different conclusions as to fair value" of such deals when viewed on a "stand-alone basis."

72.     Over the years, the Company's directors have demonstrated a deference to other Company executive officers as well. Catherine Loucks Boruch is the wife of Defendant John Boruch, the Company's former President, Chief Operating Officer and Director. Until December 30, 2005, Catherine Boruch was employed as the Company's Senior Vice President, Human Resources. Ms. Loucks' base salary, severance, fringe benefits and bonus earned for 2005 were $215,250, $225,000, $11,675 and $0, respectively.

73.     Director Defendant Churchill is a managing general partner of SCP Partners. Director Roger Carolin is currently a venture partner at SCP Partners. Because of this existing professional relationship, Director Carolin lacks sufficient independence with which to render a disinterested decision on whether to pursue Derivative Claims against Director Churchill.

74.     Director John T. Kim, is the son of Director Defendant James Kim, and therefore lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against Defendant Director James Kim.

75.     The Compensation Committee of the Board of Directors determines, reviews and makes recommendations to the Board regarding the compensation policy for Amkor's officers and directors.   The Compensation Committee is comprised of Defendant Churchill.  As Defendant Churchill singularly controls the other Defendants' compensation, the remaining members of the Board will not institute this action against Defendant Churchill.  To do so would jeopardize each Director's personal financial compensation.   Thus, demand on Defendants Hinckley, Kim and Zug and Directors Carolin, John Kim and Papadakis is futile.

76.     In addition, should the Director Defendants decide to bring claims against themselves, it would likely trigger an "insured vs. insured" exclusion which is typical for D&O insurance policies, which would make D&O insurance coverage unavailable to them.

77.     In addition, demand would be a futile and useless for the additional following reasons:

> a.     The Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;
>
> b.     The Director Defendants of Amkor, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Amkor's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.   Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith

business judgment and amounted to gross negligence and extreme recklessness;

c.      In order to bring this suit, a majority of the Directors of Amkor would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

d.      The acts complained of constitute violations of the fiduciary duties owed by Amkor's officers and directors and these acts are incapable of ratification; and

e.      Amkor has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Amkor any part of the damages Amkor suffered and will continue to suffer.

78.      Plaintiff has not made any demand on the shareholders of Amkor to institute this action since demand would be a futile and useless act for the following reasons:

a.      Amkor is a publicly held company with approximately 176.72 million shares outstanding, and thousands of shareholders;

b.      Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

c.      Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

79.      Amkor has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include, but are not limited to:

a.      Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts.

b.    Costs incurred relating to the formal SEC probe.

**FIRST CAUSE OF ACTION**
**Against Individual Defendants**
**for Breach of Fiduciary Duty**

80.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

81.    The Individual Defendants owed and owe Amkor fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Amkor the highest obligation of good faith, fair dealing, loyalty and due care.

82.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

83.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

84.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Amkor has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

I:\AmkorTechnology\Pleadings\Amended Complaint.doc

85.     Plaintiff, on behalf of Amkor, has no adequate remedy at law.

## SECOND CAUSE OF ACTION
### Against The Individual Defendants
### for Abuse of Control

86.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

87.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Amkor, for which they are legally responsible.

88.     As a direct and proximate result of the Individual Defendants' abuse of control, Amkor has sustained significant damages.

89.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

90.     Plaintiff, on behalf of Amkor, has no adequate remedy at law.

## THIRD CAUSE OF ACTION
### Against The Individual Defendants
### for Gross Mismanagement

91.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

92.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Amkor in a manner consistent with the operations of a publicly held corporation.

93.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Amkor has sustained significant damages.

94.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

95.     Plaintiff, on behalf of Amkor, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION
### Against The Individual Defendants
### for Waste of Corporate Assets

96.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

97.     As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused Amkor to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

98.     As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

99.     Plaintiff, on behalf of Amkor, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### Against The Director Defendants
### for Unjust Enrichment

100.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

101.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Amkor.

102.   Plaintiff, as shareholder and representative of Amkor, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.   Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

I:\AmkorTechnology\Pleadings\Amended Complaint.doc

C.     Awarding to Amkor restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  June 16, 2006.                     Respectfully submitted,


                                          _____s/William B. Federman_____
                                          William B. Federman
                                          FEDERMAN & SHERWOOD
                                          120 N. Robinson, Suite 2720
                                          Oklahoma City, OK 73102
                                          Telephone:  (405) 235-1560
                                          Facsimile:   (405) 239-2112
                                               - and –
                                          2926 Maple Avenue, Suite 200
                                          Dallas, TX  75201


                                          Edwin "Brad" Stanley
                                          EDWIN B. STANLEY, P.C.
                                          8767 East Via de Commercio, Ste. 103
                                          Scottsdale, AZ  85258
                                          Telephone:  (480) 607-0780
                                          Facsimile:  (480) 907-2950

I:\AmkorTechnology\Pleadings\Amended Complaint.doc

## <u>CERTIFICATE OF SERVICE</u>

On the 16th day of June, 2006, a true and correct copy of the foregoing was mailed via regular mail to:

David B. Rosenbaum
Maureen Beyers
OSBORN MALDEON P.A.
2929 N. Central Ave.
Phoenix, AZ  85012

Attorneys for Defendants

\_\_s/William B. Federman_____
William B. Federman